IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ROBERT RANDOLPH                                             PLAINTIFF

v.                                    CIVIL NO. 08-5090

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                              DEFENDANT

## MEMORANDUM OPINION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a

decision of the Commissioner of the Social Security Administration (Commissioner) denying

his claim for period of disability and disability insurance benefits (DIB) under the provisions of

Title II of the Social Security Act (Act).   In this judicial review, the court must determine

whether there is substantial evidence in the administrative record to support the Commissioner's

decision. *See* 42 U.S.C. § 405(g).

## I.    Procedural Background:

Plaintiff protectively filed his current application for DIB on October 22, 2004, alleging

an inability to work since September 20, 2002, due to a disorder of the lower extremity and

osteoarthritis.[1]  (Tr. 49).   An administrative hearing was held on March 2, 2007, at which

plaintiff appeared with counsel. (Tr. 306-360).  Plaintiff, plaintiff's wife and a vocational expert

testified at the administrative hearing.

---

[1]Plaintiff amended his alleged onset date to August 18, 2004.  (Tr. 13, 321).

By written decision dated July 30, 2007, the ALJ found that during the relevant time period plaintiff had an impairment or combination of impairments that were severe. (Tr. 15). However, after reviewing all of the evidence presented, she determined that plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 15-16). The ALJ found plaintiff retained the residual functional capacity (RFC) to perform sedentary work, which entails the ability to lift a maximum of ten pounds, sitting six hours in an eight-hour workday and standing six hours in an eight-hour workday.[2] The ALJ found plaintiff is limited in pushing and pulling using the lower extremity; and that plaintiff needed to elevate his lower extremities below waist level three times per day. The ALJ found plaintiff may occasionally bend, crouch, and climb ramps and stairs but must never stoop, crawl, kneel, balance, squat or climb ladders, ropes or scaffolds. The ALJ found plaintiff is to avoid unprotected heights and dangerous equipment, weather extremes and wetness. Due to the side effects of pain medication, the ALJ found plaintiff cannot perform driving occupational duties or use a firearm. (Tr. 16). Further, the ALJ found plaintiff retains the ability to follow non-complex simple instructions, requiring little judgment. The ALJ found plaintiff is also able to learn by rote, with few variables; and that plaintiff requires concrete, direct and specific supervision. With the help of a vocational expert, the ALJ determined plaintiff could perform other work as a small production operator and a small products assembler. (Tr. 20).

---

[2]We note, the ALJ found plaintiff could do sedentary work but then defined that plaintiff could stand and walk six out of eight hours in a work day. (Tr. 16). We believe this to be a misstatement and note all the jobs the vocational expert found plaintiff able to perform fit the sedentary work requirements.

Plaintiff then requested a review of the hearing decision by the Appeals Council, which, denied that request on February 20, 2008. (Tr. 3-6). Subsequently, plaintiff filed this action. (Doc. 1). This case is before the undersigned pursuant to the consent of the parties. (Doc. 4). Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. 6,9).

## II.   Evidence Presented:

At the administrative hearing before the ALJ on March 2, 2007, plaintiff testified he was thirty years of age with a high school education. (Tr. 311). Plaintiff testified he was in special education classes starting in the eighth grade. (Tr. 312). Plaintiff's past relevant work consists of work as an auto detailer, a warehouseman, a poultry farm laborer, a construction worker II, a truck washer and a mechanic helper. (Tr. 322-323).

The medical evidence prior to the amended alleged onset date reflects the following. On September 20, 2002, plaintiff was involved in a motorcycle accident and sustained a comminuted bicondylar tibial plateau fracture of the left leg with associated compartment syndrome. (Tr. 160-161, 252). He underwent a limited internal fixation with application of a hybrid external fixator on September 21, 2002. (Tr. 164). Due to impending compartment syndrome, however, plaintiff also underwent lateral and medial fasciotomies to the left calf. X-rays following surgery were unremarkable. (Tr. 183). On September 24, 2002, the left lateral calf wound was closed. (Tr. 163). Then, on September 26, 2002, Dr. Rodger Dickinson, Jr., closed the medial calf wound. (Tr. 162). Subsequently, plaintiff was able to increase his activity. (Tr. 159). By September 28, 2002, he was afebrile and in a moderate amount of pain. Records indicate that plaintiff was ambulating via crutches with touchdown weight-bearing. His wounds and his neurovascular status were noted to be intact. Accordingly, plaintiff was discharged home. Dr.

-3-

Dickinson gave plaintiff a prescription for Percocet and prescribed continuous passive motion ("CPM").  (Tr. 159, 223, 272-273).

On October 1, 2002, plaintiff's wounds looked "fine."  (Tr. 281).  Dr. Dickinson indicated that plaintiff should work on touchdown weight-bearing, range of motion, and CPM.

On October 17, 2002, an x-ray of plaintiff's left leg showed good restoration of the anatomy of the tibial plateau.  (Tr. 280).  Dr. Dickinson noted that plaintiff continued to have problems with the pins, noting a few early pin track infections on the wires.  He redressed everything and placed plaintiff on Keflex.  Dr. Dickinson continued to limit plaintiff to touchdown weight-bearing and range of motion exercises.

On October 28, 2002, plaintiff reported a fair amount of pain.  (Tr. 279).  He was continuing to get pin track infections, so Dr. Dickinson scheduled him to have his external fixator removed.   Plaintiff was to be non-weight-bearing. He also prescribed Percocet for the pain.

On October 29, 2002, plaintiff underwent the removal of the external fixation in the left tibia. (Tr. 152, 220, 251).  X-rays following the procedure noted a healing intraarticular fracture of the proximal tibia with a probable loose bone fragment in the lateral compartment of the knee. (Tr. 156).  Dr. Dickinson noted that plaintiff tolerated the procedure well and was sent to recovery in good condition. (Tr. 152).  Plaintiff was later released home with instructions not to perform weight-bearing activities.  (Tr. 271).

On November 8, 2002, plaintiff had a range of 5 to100 degrees of motion in his left knee. (Tr. 218).   Dr. Dickinson noted plaintiff was in a fracture brace.  Dr. Dickinson noted that plaintiff's knee looked much better.  It was not as swollen or tender as it had previously been.

In addition, the x-ray looked "really good."  As such, Dr. Dickinson told him to stick with touchdown weight-bearing and to wear his brace when up and active.

On November 22, 2002, Dr. Dickinson ordered physical therapy.  (Tr. 217).  He also released plaintiff to begin weight-bearing activity as tolerated to increase his range of motion. X-rays were unchanged.  Dr. Dickinson noted that plaintiff would still need to use his crutches for another two weeks, but at the end of that two week period, he could begin just using his brace.

On November 25, 2002, plaintiff was admitted for physical therapy.  (Tr. 140, 143, 265). By December 23, 2002, plaintiff indicated that his knee was feeling better.  (Tr. 146).  He stated that he was riding a bicycle at home, and that seemed to be helping.  Although he continued to experience pain related to the use of his knee, on January 12, 2003, the physical therapist noted that he was doing well with his strengthening program.  (Tr. 149, 264).  At that time, plaintiff was seven degrees away from full extension of his left knee.  (Tr. 149).

On December 13, 2002, plaintiff reported putting more weight on his left leg.  (Tr. 216). Although he still had a lot of swelling in his knee, he had almost a 15 degree flexion contracture with about 100 degrees of flexion.  As x-rays were unchanged, plaintiff was advised to continue his exercises and wear his brace when he was up and ambulating.  Dr. Dickinson recommended plaintiff continue physical therapy and to remain off of work.

On January 10, 2003, plaintiff had between 105 to110 degrees of flexion, but continued to have a flexion contracture of only ten degrees.  (Tr. 215).  As such, Dr. Dickinson opted to give him a Dyna splint to use at night to try and get him to full extension.  X-rays revealed some slight concerns regarding irregularity in the articular surface, but the fracture appeared to be

AO72A
(Rev. 8/82)

healing.  Dr. Dickinson talked to plaintiff about finding a job that did not require a lot of heavy walking or standing.

On January 31, 2003, plaintiff remained in a fair amount of pain and discomfort.  (Tr. 214).  He indicated that his bicycle was helpful.  Dr. Dickinson noted that plaintiff had a Dyna splint and that plaintiff now had about eight degrees flexion and twelve degrees contracture.  He advised plaintiff to stay in the splint and encouraged him to ride his stationary bicycle daily.  Dr. Dickinson recommended plaintiff remain off of work.

On February 21, 2003, plaintiff's wounds were well healed.  (Tr. 213).  His range of motion was "pretty good," from about 5 degrees to 120 degrees.  Plaintiff had some slight varus of his tibia, as well as, discomfort with walking and ambulation.  A x-ray revealed a faint fracture line medially, but the remainder of the fracture appeared to be healed.  There was also some slight incongruence of the joint.  Accordingly, Dr. Dickinson advised plaintiff to stick with his bicycle and prescribed Mobic.  He also told plaintiff that he needed to find a "sitting job" to do because there was no way he was going to get back to doing any kind of heavy construction work requiring him to stand and walk.

On February 26, 2003, Dr. Dickinson wrote a letter indicating that plaintiff was still recovering from a severe injury to his left leg.  (Tr. 212).  He noted that plaintiff was still using one crutch to ambulate, did not yet have good function, and was unable to do any kind of prolonged standing, walking, stairs, stooping, or crawling.  Accordingly, Dr. Dickinson opined that plaintiff was not yet able to return to work.

On April 4, 2003, plaintiff was still using his cane to some degree.  (Tr. 211).  He was reportedly taking Mobic for pain, which did help.  On examination, plaintiff had a good range

-6-

of motion. However, there was still some tenderness and soreness. An x-ray showed good bone healing, but continued problems with the joint. Dr. Dickinson noted that plaintiff would develop arthritic changes and would need a sedentary job that did not require standing and walking. He advised plaintiff to look into vocational rehabilitation.

On April 20, 2003, plaintiff sought emergency treatment after stepping in a hole and twisting his left knee. (Tr. 128, 131). An x-ray revealed an old proximal left tibia fracture, but no acute process. (Tr. 132). As swelling was noted, the treating doctor removed fluid from plaintiff's knee. (Tr. 131). Following a diagnosis of knee effusion, plaintiff was discharged home with instructions to rest, elevate, and ice his knee. (Tr. 130-131).

On April 21, 2003, Dr. Dickinson stated that plaintiff's knee effusion could be due to some sort of inflammatory arthritis. (Tr. 210). As such, he opted to keep him on anti-inflammatories and ice. Dr. Dickinson noted if plaintiff failed to improve arthroscoping the knee might be considered.

On April 24, 2003, plaintiff's knee had improved. (Tr. 209). Dr. Dickinson advised him to continue to use one crutch, slowly increasing his activity.

On May 8, 2003, progress notes reveal that plaintiff had less pain and swelling. (Tr. 208). He was wearing a brace and continuing with his exercises, including his bicycle. As far as his ability to return to work, Dr. Dickinson indicated that he did not feel that plaintiff would ever be able to go back to the type of work he had previously performed. He stated that plaintiff would not be able to meet the standing and walking requirements, as his left knee would not tolerate it.

AO72A
(Rev. 8/82)

On May 29, 2003, plaintiff indicated that his left knee had improved. (Tr. 207). No effusion was present, but there was still residual compartment syndrome, crepitance, and some slight loss of motion. Without a doubt, Dr. Dickinson noted that plaintiff would develop traumatic arthritis. As such, he instructed plaintiff to find a job he could "sit at." Dr. Dickinson stated that plaintiff did not need to be doing any kind of work that would require him to stand and walk because his knee would not tolerate it. Further, he indicated that if plaintiff's knee flared up again, he would perform an arthroscope. Plaintiff was then told to wear his brace when he was up and about.

On July 30, 2003, plaintiff had a follow-up with Dr. Dickinson. (Tr. 206). An examination revealed a good range of motion, but continued pain with "a lot of activity." Due to what appeared to be a prominent screw over the lateral aspect of the knee, Dr. Dickinson ordered an updated x-ray of plaintiff's left knee. He noted that everything appeared to be healed, although plaintiff still had some incongruity in the joint. Dr. Dickinson also stated that plaintiff would develop some arthritic changes. The x-ray showed a comminuted tibial plateau fracture healed with three large screws in place with some varus deformity noted. Accordingly, plaintiff was restricted from performing any job requiring heavy manual labor, walking or standing. However, Dr. Dickinson released plaintiff to swim and bicycle for exercise. He then prescribed Tylenol during the day and Vicodin at night.

On January 9, 2004, plaintiff continued to have discomfort, especially with activity. (Tr. 205). He indicated that walking caused swelling and discomfort. At this time, plaintiff also voiced some problems concerning his right knee. He stated that he had squatted down the previous week when he felt a pop in his right knee. Since that time, he had experienced

persistent pain. X-rays of both knees showed no evidence of fracture or dislocation in the right knee. However, there was some early osteophyte formation coming off of the medial compartment of the left knee. Dr. Dickinson indicated that plaintiff's left knee was showing some arthritic changes and would slowly worsen over time. As for his right knee, he was concerned that plaintiff might have a meniscal tear. Since plaintiff's condition had improved "a little bit," Dr. Dickinson placed him on Mobic. He stated that if plaintiff's right knee worsened, he would probably need an arthroscopy.

On May 10, 2004, Dr. Dickinson completed a RFC assessment. (Tr. 243-245). He indicated that plaintiff could sit for six hours during an eight-hour workday, stand for one hour, walk for one hour, and work for eight hours. (Tr. 243). With regard to lifting, Dr. Dickinson found that plaintiff was able to occasionally lift/carry up to ten pounds, but could never lift/carry anything heavier, due to injury to both legs. He stated that plaintiff could use his right foot for repetitive movements as in operating foot controls. (Tr. 244). Further, Dr. Dickinson noted that plaintiff could be continuously exposed to dust, fumes, and noise; frequently be exposed to unprotected heights, be around moving machinery, and be exposed to marked temperature changes; occasionally bend, reach above, and drive automotive equipment; and, never squat, crawl, climb, crouch, or kneel. (Tr. 244). He then indicated that plaintiff's pain was severe. (Tr. 245).

On May 12, 2004, treatment notes indicate plaintiff was developing traumatic arthritis of the left knee that was causing marked restrictions. (Tr. 204). Dr. Dickinson noted plaintiff could not kneel, squat, get down on the left knee or do any significant standing or walking due to pain and discomfort in his left knee. Dr. Dickinson noted plaintiff was also having problems

-9-

with his right knee catching and locking.  Dr. Dickinson opined plaintiff has had mechanical problems with his right knee and thought plaintiff would ultimately need surgery.  Dr. Dickinson gave plaintiff Vioxx to take once a day and some Vicodin for pain.  Dr. Dickinson did not expect plaintiff to "get back to being gainfully employed."   Dr. Dickinson noted with plaintiff's education level it would be difficult to get back into the workforce.  Dr. Dickinson opined plaintiff was unable to do anything that requires standing or walking.  He indicated plaintiff could do some intermittent sitting but would need to get up and down.  Dr. Dickinson opined plaintiff could not stand and/or walk for more than five minutes per hour.

Progress notes dated June 4, 2004, report plaintiff complained of raised red marks on his face, neck, stomach and legs.  (Tr. 202, 249).  Treatment notes indicate plaintiff was not taking any medication.  Dr. John Nolen noted plaintiff had a normal gait and station.  Plaintiff was diagnosed with insect bites without infection with secondary cellulitis.

The medical evidence during the relevant time period reflects the following.  On October 13, 2004, plaintiff was examined by orthopaedic doctor, Tom Patrick Coker, M.D.  (Tr. 259). Dr. Coker noted plaintiff's left tibial plateau injury was healed but that plaintiff continued to have chronic pain.  Dr. Coker noted x-rays showed arthritis and that plaintiff reported pain with activity.  Upon examination, of the left lower extremity, Dr. Coker noted plaintiff had lost two degrees of full extension and five degrees of full flexion; that plaintiff's was stable to varus/valgus; and that plaintiff was stable to cruciate.  Dr. Coker noted plaintiff had pain, crunching and popping throughout his arc of motion.  Dr. Coker noted plaintiff had effusion that was one-plus to a trace with no real meniscal complaints compared to what he would expect. Dr. Coker noted plaintiff was apprehensive to range of motion.  Dr. Coker did not think the

-10-

hardware was hurting plaintiff and that an arthroscope might be of some benefit.  Dr. Coker noted plaintiff would be seeing Dr. Dickinson and noted that would be good because Dr. Dickinson was the operating surgeon.  Dr. Coker opined plaintiff would not be able to work in a stand-up type job and thought that even sitting for eight hours at a time would be difficult.  Dr. Coker thought plaintiff might be able to perform some part-time employment.  Dr. Coker also noted the early onset of arthritis that would probably disable plaintiff before it normally would.

On October 20, 2004, plaintiff underwent a diagnostic interview at Ozark Guidance Center, Inc. (Tr. 286).  Plaintiff reported mild to moderate depression for the past year stemming from injuries sustained in a motorcycle accident on September 20, 2002.  Plaintiff reported he was in constant pain.  Mr. Richard Carter, Ed.D LPC diagnosed plaintiff with an adjustment disorder with depressed mood and a pain disorder associated with psychological factors.

In progress notes dated October 27, 2004, Dr. Dickinson opined plaintiff was fairly incapacitated due to his knees.  (Tr. 201).  Dr. Dickinson noted plaintiff was markedly restricted as far as his activities.  Dr. Dickinson noted he had plaintiff on Vioxx but was going to switch plaintiff to Mobic once a day, and hydrocodone for pain.

Individual therapy notes dated November 10, 2004, report plaintiff discussed his session with his wife and that he feels things are much better at home.  (Tr. 289).  He also stated since his first session he is not angry anymore.  Plaintiff was discharged on January 18, 2005.  (Tr. 291).

On November 14, 2004, plaintiff underwent a Rehabilitation Initial Diagnosis And Assessment For Clients, Arkansas Rehabilitation Services performed by Leslie S. Johnson, M.S., Licensed Psychological Examiner.  (Tr. 300-302).  Plaintiff reported he graduated from high

-11-

school but noted he was in resource classes from the sixth or seventh grade. (Tr. 300). Plaintiff reported during his last two years of school he received credit for working. Plaintiff reported he had mainly been employed in physical labor jobs. Ms. Johnson noted plaintiff took the Wechsler Abbreviated Scale of Intelligence test which revealed a Performance IQ of 103, a Verbal IQ of 74 and a Full Scale IQ of 86. Ms. Johnson noted plaintiff's reading comprehension skills were sampled by means of the Ohio Literacy Test and plaintiff's performance fell in the near average range. (Tr. 301). Ms. Johnson diagnosed plaintiff with Axis I: Mathematics Disorder; Axis II: no diagnosis; and Axis III: deferred to physician. (Tr. 302). Ms. Johnson opined plaintiff may have difficulty maintaining production level if more than basic academic skills are required; reading advanced technical materials; studying independently; and performing advanced computation or mathematics. Ms. Johnson opined plaintiff may need special instructional methods. Ms. Johnson opined if plaintiff was provided certain services, including extensive vocational guidance and counseling, plaintiff may reasonably be expected to sustain independent functioning by means of competitive employment.

On January 7, 2005, Dr. Jerry L. Thomas, a non-examining medical consultant, completed a RFC assessment opining that plaintiff could lift and/or carry ten pounds occasionally, less than ten pounds frequently; could stand and/or walk (with normal breaks) for a total of at least two hours in an eight-hour workday; could sit (with normal breaks) for a total of about six hours in an eight-hour workday; and could push and/or pull (including operation of hand an/or foot controls) unlimited other than as shown for a lift and/or carry. (Tr. 226-232). Dr. Thomas opined plaintiff had no postural, manipulative, visual or communicative limitations. On January 18, 2006, Dr. Robert Beard affirmed Dr. Thomas's assessment. (Tr. 232).

-12-

Progress notes dated January 11, 2005, report plaintiff's complaints of an upper respiratory infection for the past four days. (Tr. 241-242, 253-258). Plaintiff reported he was not taking any medication. Plaintiff was diagnosed with sinusitis, cough, hoarseness and elevated blood pressure. Dr. Shannon Wipf prescribed Amoxil and Robitussin AC.

On November 28, 2005, plaintiff reported a marked increase in pain, discomfort and soreness, especially in his left knee. (Tr. 240). Dr. Dickinson noted plaintiff has a lot of pain and discomfort and crepitation medially. Plaintiff also reported trouble with his left elbow. X-rays of left knee showed early osteoarthritic changes involving the medial and lateral compartments. X-rays of the right knee showed some narrowing in the medial compartment of the right knee with no significant osteophyte. Dr. Dickinson noted a worsening of plaintiff's osteoarthritis of the left knee. He noted plaintiff cannot do any prolonged standing or walking due to discomfort. Dr. Dickinson noted plaintiff's right knee was giving him problems as well. Dr. Dickinson explained to plaintiff that he was too young to consider a joint replacement but that may ultimately be where plaintiff ends up. Dr. Dickinson gave plaintiff samples of Celebrex and a prescription for Vicodin.

On November 25th, Dr. Dickinson also completed a Medical Source Statement opining plaintiff could lift and/or carry less then ten pounds; stand and/or walk a total of four hours in an eight-hour workday, one and one half hours continuously; sit a total of eight hour in an eight-hour workday, four hours continuously; and push and/or pull but limited in the lower extremities. (Tr. 238-239). Dr. Dickinson opined plaintiff would need three or four work or bathroom breaks in an eight-hour workday and that plaintiff would need to elevate his lower extremity three times per day. Dr. Dickinson opined plaintiff would need to lay in a supine position for a total of eight

-13-

hours.  Dr. Dickinson opined based on the limitations listed above, plaintiff could perform any work activities in a normal workday for a total of six hours, two hours continuously.  Dr. Dickinson opined plaintiff could never climb, balance, stoop, squat or kneel; and could occasionally crouch and bend.  Dr. Dickinson opined plaintiff had no manipulative limitations. He further opined plaintiff should avoid all exposure to extreme cold and hazards; and avoid moderate exposure to extreme heat, wetness and humidity.  Dr. Dickinson noted the objective evidence to support his opinion included evidence of a severe left leg post-traumatic injury with compartment syndrome and right knee effusion and decreased range of motion.

On March 1, 2006, plaintiff reported he was "getting worse." (Tr. 237).  Dr. Dickinson noted both of plaintiff's knees were giving him problems and that plaintiff ultimately would probably need a left knee replacement.  Plaintiff also reported a lot of pain with his right elbow and increasing pain in his back.  Dr. Dickinson opined the back pain was due to plaintiff's gait abnormality and persistent problems.  Dr. Dickinson opined plaintiff was "definitely disabled and unemployable." Dr. Dickinson stated he expected plaintiff's condition to slowly get worse. Plaintiff was prescribed Vicodin for pain and Ambien for sleep.  Plaintiff was also given a steroid injection in his lateral epicondyle.  Dr. Dickinson stated "the bottom line is basically he is slowly getting worse over time, as expected."

Plaintiff underwent a diagnostic interview at Ozark Guidance Center on March 14, 2006. (Tr. 292).  Plaintiff complained of crying for no reason, isolating himself, sleep disturbance, loss of appetite, lack of energy and anger for the last four to six months.  Plaintiff reported he was taking Hydrocodone and had done so since 2002.  Plaintiff also reported he had been taking Ambien for one week.  Plaintiff was diagnosed with major depressive disorder recurrence

-14-

moderate pain disorder associated with psychological factors.  Plaintiff was given a global assessment of functioning score of 60.

Individual therapy notes dated March 27, 2006, report plaintiff was less depressed but was still going to schedule an appointment with his primary care physician to discuss medication options. (Tr. 295).  Plaintiff reported he was on his way home when a tornado came through and softball size hail broke the windshield on the car he was driving.  Plaintiff processed this event during the session and was grateful his home was not destroyed.

Individual therapy notes dated April 11, 2006, report plaintiff responded well to treatment plan objectives and appeared to be doing better.  (Tr. 297).  Plaintiff reported he started reading the anger management book but had not completed it.  Plaintiff reported he was still experiencing a lot of pain in his leg and he felt that was the basis for his depression.

Individual therapy notes dated April 27, 2006, report plaintiff processed the anger management workbook that he has been working on in relation to his depression. (Tr. 283, 285). Plaintiff reported coming to therapy has helped him recognize where his anger comes from and how it has effectuated his depression.  Plaintiff reported he really missed his job and being productive but since his motorcycle injury he has not been able to do much of anything.  Plaintiff reported he was getting out more with his family and that his wife told him he has been happier since starting therapy.

On June 9, 2006, plaintiff reported back, knee and left elbow pain.  (Tr. 275).  Dr. Dickinson noted plaintiff's biggest issue is his knees.  Specifically, traumatic osteoarthritis in his left knee and some degenerative changes in his right knee.  Dr. Dickinson also noted he had viewed a video the insurance company had done showing plaintiff doing activities that plaintiff

-15-

said he was unable to do. Despite the video, Dr. Dickinson agreed that plaintiff definitely had some significant problems with his knees and that doing long term heavy manual labor was going to give plaintiff a lot of problems. Dr. Dickinson noted plaintiff would stay on Celebrex and his regular activities.

On February 9, 2007, plaintiff complained of low back and knee pain. (Tr. 261). Plaintiff described the intensity of his pain as moderate. Plaintiff's reported symptoms were pain with stairs, locking, popping, and joint stiffness. Plaintiff reported due to knee pain he was able to walk less than five blocks. Plaintiff indicated he did not use an assistive device. Plaintiff reported his back pain was most prominent in the lower lumbar spine. Plaintiff reported his pain is moderate in intensity with acute exacerbation. Plaintiff reported some pain relief with rest, heat and narcotic pain medication. His pain worsened with walking, back extension and twisting. Dr. Dickinson noted plaintiff was not taking any medication. After examining plaintiff, Dr. Dickinson diagnosed plaintiff with knee pain, low back pain and osteoarthritis of the knee. Dr. Dickinson prescribed Vicodin and Celebrex and recommended a MRI of the lumbar spine. (Tr. 262).

Plaintiff underwent a MRI of his lumbar spine on February 9, 2007, which revealed diffuse low signal changes involving the bone marrow on T2 weighted images which may represent underlying myelofibrosis; a mild degenerative disc desiccation and degenerative change at L1-2 and L4-5 without significant neural foraminal or central canal compromise; no extruded or sequestered disc fragments; a negative conus medullaris; and facet arthropathy at L3-4 and L4-5. (Tr. 260).

-16-

III.   **Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently.  *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)©.  A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

-17-

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § 404.1520. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his residual functional capacity. *See McCoy v. Schwieker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § 404.1520.

**IV.    Discussion:**

Plaintiff contends that the ALJ erred in concluding that the plaintiff was not disabled since August 18, 2004, his amended alleged onset date. Defendant contends the record supports the ALJ determination that plaintiff was not disabled through the date of the ALJ decision.

**A.    Subjective Complaints and Credibility Analysis:**

In disability determinations, credibility assessments are the province of the ALJ. *Onstead v. Sullivan*, 962 F.2d 803, 805 (8th Cir. 1992). This court will not substitute its judgment for that of the trier of fact, *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996), nor will we disturb the decision of any ALJ who seriously considers, but for good reason explicitly discredits, a claimant's testimony of disabling pain. *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies

-18-

appear in the record as a whole. *Id.* As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart,* 314 F.3d 964, 966 (8th Cir. 2003). We believe the ALJ adequately evaluated the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), and conclude there is substantial evidence supporting the ALJ's determination that plaintiff's complaints were not fully credible.

The record reflects that during the relevant time period plaintiff sought treatment for residual pain and problems associated with his injuries, including a comminuted bicondylar tibial plateau fracture of the left leg with associated compartment syndrome, sustained in a motorcycle accident in September of 2002. During the relevant time period, plaintiff sought treatment for his left and right knee, lower back and elbow pain on October 27, 2004, November 28, 2005, March 1, 2006, June 6, 2006 and February 9, 2007. Plaintiff was treated with medication and physical therapy. It is notable that while plaintiff did consistently report pain when he sought treatment had plaintiff been suffering to the degree alleged it is hard to believe that he would not have sought medical treatment more frequently. The record shows, Dr. Dickinson did indicate plaintiff might need to undergo an athroscope of the knee in the future but there is no evidence that plaintiff did indeed undergo the procedure or that plaintiff did not undergo the procedure due to lack of finances as alleged by plaintiff at the hearing. Dr. Dickinson also noted that plaintiff may in the future need a knee replacement but that he was too young for the procedure. While the evidence clearly establishes plaintiff does have pain caused by his injuries, we find substantial evidence supporting the ALJ determination that plaintiff's knee, elbow and lower back impairment are not disabling.

-19-

Plaintiff also alleges disabling depression.  A review of the record reveals plaintiff has sought treatment for depression and an adjustment disorder.  Plaintiff was never prescribed medication to treat his depression and was given a global assessment of functioning score of 60 which represents moderate symptoms.  Therapy notes indicate plaintiff responded well to individual therapy.  In April of 2006, plaintiff's last therapy appointment, reports plaintiff was getting out more with his family and his wife had told him he seemed much happier.

Although plaintiff contends that his failure to seek medical treatment is excused by his inability to afford treatment, plaintiff has put forth no evidence to show that he has sought low-cost medical treatment or been denied treatment due to his lack of funds.  *Murphy v. Sullivan*, 953 F.3d 383, 386-87 (8th Cir. 1992) (holding that lack of evidence that plaintiff sought low-cost medical treatment from her doctor, clinics, or hospitals does not support plaintiff's contention of financial hardship).

With regard to the testimony of plaintiff's wife, the ALJ properly considered her testimony but found it unpersuasive.  This determination was within the ALJ's province.  *See Siemers v. Shalala*, 47 F.3d 299, 302 (8th Cir. 1995); *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir. 1993).

Plaintiff's subjective complaints are also inconsistent with evidence regarding his daily activities.  Plaintiff completed forms indicating he was able to take care of his personal needs, to prepare simple meals, to dry and fold laundry, to drive, to watch television and to spend time with his family.  (Tr. 80-83).  In June of 2006, Dr. Dickinson noted he had viewed a video of plaintiff performing activities that plaintiff reported he was unable to perform.  At the hearing plaintiff testified that he thought the video showed he and a friend unloading a porch deck off

-20-

of a small trailer. (Tr. 336). Plaintiff testified however that he did not do any lifting and that after helping he spent two days recovering. (Tr. 337-338). While the record clearly shows plaintiff does have some limitations with activities of daily living, the limitations supported by the record are not as extreme as alleged by plaintiff. *See Hutton v. Apfel*, 175 F.3d 651, 654-655 (8th Cir. 1999) (holding ALJ's rejection of claimant's application supported by substantial evidence where daily activities– making breakfast, washing dishes and clothes, visiting friends, watching television and driving-were inconsistent with claim of total disability)

Therefore, although it is clear that plaintiff suffers with some degree of limitation, he has not established that he is unable to engage in any gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning his daily activities support plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

### B. RFC Assessment:

We next turn to the ALJ's assessment of plaintiff's RFC. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. *Id*. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his or his limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).

-21-

Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." *Id*.

Plaintiff argues that the ALJ did not give proper weight to Dr. Dickinson's RFC assessment and opinion that plaintiff was disabled and unable to work. Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record. *See Randolph v. Barnhart,* 386 F.3d 835, 839 (8th Cir.2004); 20 C.F.R. § 404.1527(d)(2). A medical source opinion that an applicant is "disabled" or "unable to work," however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. *See Stormo v. Barnhart,* 377 F.3d 801, 805 (8th Cir. 2004)("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(2). Thus, to the extent that the ALJ discredited Dr. Dickinson's conclusions that plaintiff could not work, she rightly did so.

-22-

With regard to disregarding some of the findings made in Dr. Dickinson's November 25, 2005, assessment, as well as, treatment notes we find the ALJ properly addressed the weight she gave to Dr. Dickinson and her reasoning for discounting some of Dr. Dickinson's findings.  In discounting some of Dr. Dickinson's limitations listed in the medical source statement, the ALJ specifically addresses Dr. Dickinson's June 9, 2006, treatment notes wherein Dr. Dickinson states he viewed a video showing plaintiff performing activities plaintiff reported he was unable to perform.  Dr. Dickinson further noted despite the video, plaintiff definitely had some significant problems with his knees and that doing long term heavy manual labor was going to give plaintiff a lot of problems.  Based on the entire evidence of record, we find the ALJ properly addressed the weight she gave to Dr. Dickinson's opinion and that there is substantial evidence of record to support her RFC findings.

### C.    Hypothetical Proposed to Vocational Expert:

Plaintiff contends the hypothetical proposed to the vocational expert failed to include limitations due to plaintiff's illiteracy and intellectual functioning.  Regarding plaintiff's ability to read, plaintiff testified at the administrative hearing that he does not do very much reading on his own.  (Tr. 341).  Plaintiff testified he had difficulty reading and helping his son, who is in kindergarten, do his homework.  (Tr.341-342).  Plaintiff also testified he participated in special education classes starting around the eighth grade.  (Tr. 312).  Plaintiff's testimony of an inability to read at even the kindergarten level is at odds with other evidence in the record.  In November of 2004, Ms. Johnson noted plaintiff's reading comprehension skills were sampled by means of the Ohio Literacy Test and plaintiff's performance fell in the near average range.  In April of 2006, plaintiff reported to the individual therapist that he was reading the anger management

-23-

book and that it was helping with his mood at home. (Tr.297). Furthermore, plaintiff indicated he completed the forms regarding his application for disability. (Tr. 94).

Plaintiff contends the ALJ also erred in failing to include plaintiff's borderline intellectual functioning when proposing a hypothetical question to the vocational expert. We note while plaintiff did score a Verbal IQ of 74, his Full Scale IQ was 86 which falls within the below average range of intelligence not in the borderline range. *See Hutsell v. Massanari,* 259 F.3d 707, 709 n. 3 (8th Cir.2001) ( "Borderline intellectual functioning is a condition defined as an IQ score within the 71-84 range while mental retardation is a score of about 70 or below." ). The ALJ clearly acknowledged plaintiff's level of functioning when she limited plaintiff to unskilled work. *Hillier v. Social Sec. Admin.*, 486 F.3d 359, 365-366 (8th Cir. 2007) (by limiting claimant  to simple, concrete work, the ALJ captured the practical consequences of claimant's low average to borderline intellectual functioning).

After thoroughly reviewing the hearing transcript along with the entire evidence of record, we find that the hypothetical the ALJ proposed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. *See Goff v. Barnhart,* 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, we find that the vocational expert's testimony constitutes substantial evidence supporting the ALJ's conclusion that plaintiff's impairments do not preclude him from performing other work as a small production operator and a small products assembler. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

-24-

**V.**    **Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed.  The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 17th day of June 2009.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)